IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ROBERT CLARK, | § | |
| | § | |
| Plaintiff, | § | |
| V. | § | CIVIL ACTION NO. C-04-06 |
| | § | |
| KELLY STRONG, | § | |
| | § | |
| Defendant. | § | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT, AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. On December 17, 2004, Defendant Kelly Strong ("Defendant" or "Strong") filed a motion to dismiss for failure to exhaust administrative remedies and an alternative motion for summary judgment. (D.E. 48, hereinafter "Def. Mot."). Plaintiff Robert Clark ("Plaintiff" or "Clark") filed a response on January 6, 2005. (D.E. 55, hereinafter "Pl. Resp."). On December 21, 2004, the Clerk received from Plaintiff a motion for summary judgment, (D.E. 49), to which Defendant responded on January 11, 2005. (D.E. 57). For the reasons stated herein, Defendant's motion to dismiss Plaintiff's claims for monetary damages against Strong in her official capacity based on Eleventh Amendment immunity is GRANTED. The remainder of Defendant's motion is DENIED and Plaintiff's motion for summary judgment is DENIED.

## I. JURISDICTION

The district court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331. Both parties have consented to the jurisdiction of a Magistrate Judge. (D.E. 10, 31). On June 17, 2004, this action was re-assigned to the undersigned by Order of Re-Assignment. (D.E. 33).

## II. PROCEDURAL HISTORY

Plaintiff is presently incarcerated at the Telford Unit in New Boston, Texas, although his claims involve incidents which occurred while he was incarcerated at the McConnell Unit in Beeville, Texas.  In his original complaint, Plaintiff sued McConnell Unit Warden Prasifka; M. Lawson, a member of the State Classification Committee ("SCC") in Huntsville, Texas; and John Doe, the member(s) of the SCC who determined that plaintiff should be returned to general population at the McConnell Unit. (D.E. 1).  The undersigned issued an Memorandum and Recommendation ("M&R") recommending that Plaintiff's failure to protect claim against Defendants Lawson and "John Doe" be retained and that plaintiff's remaining claims be dismissed for failure to state a claim. (D.E. 8).  Chief Judge Head adopted the M&R in an order entered April 30, 2004. (D.E. 16).

It was later determined that the sole individual responsible for the decision of the SCC was Kelly Strong.  Thus, the claims against M. Lawson and the John Doe members of the SCC were dismissed and Kelly Strong was added as a defendant.  The style of the case was thus changed to Robert Clark v. Kelly Strong. (D.E. 24, 25).

The Defendant's motion for summary judgment and to dismiss and Plaintiff's cross-motion for summary judgment are now ripe for decision and are addressed herein. (D.E. 48, 49).

### III.  FACTUAL BACKGROUND

The basic facts in this matter are not disputed.[1]  Plaintiff was transferred to the McConnell

---

[1] The facts as set forth herein are taken primarily from Defendant's statement of undisputed facts.  Plaintiff's response indicates that he agrees with the Defendant's 15-paragraph recitation of facts with the exception of four paragraphs (4, 5, 12, 13).  As to those four paragraphs, however, he does not state with any specificity what he disagrees with, nor point to any specific portions of the record to refute the facts he disagrees with.

Unit on March 10, 2003. (Exh. C at 5, 180).[2] When he first arrived, Plaintiff was reviewed by a Unit Classification Committee (UCC) at the McConnell Unit to determine his custody level. The UCC assigned Plaintiff to a custody level of general Population Level V. (Exh. C at 5). On the date of his arrival, March 10, 2003, Plaintiff expressed to staff a concern that "[a]nywhere I go in General Population I will be a target for violence due to my former affiliation [with the Bloods gang] and tattoos combined with my presently expressed homosexuality" and that "a simple transfer would not cure the problem." (Id. at 180).

Also on March 10, 2003, a Life Endangerment Investigation began by McConnell Unit staff to review Plaintiff for safekeeping status. Plaintiff was assigned to solitary confinement while the investigation was conducted. (Id. at 181). The investigation was completed on March 11, 2003, and forwarded to the UCC that met on March 13, 2003. The UCC recommended safekeeping. (Id. at 4, 169).

The UCC recommendation and the Life Endangerment Investigation were faxed to Defendant Strong at the State Classification Committee on March 25, 2003. (Id. at 4, 166-78). On April 10, 2003, Defendant Strong denied Plaintiff placement in safekeeping. (Exh. A, Exh. D at 12, Exh. C at 152). The single-page form denying safekeeping, which indicates it was authored by Strong, states her explanation for the denial of safekeeping:

> The below named and numbered offender was reviewed and denied placement in safekeeping. Inmate claim of being threatened while confined on McConnell Unit are uncorrobarated. Also, inmate diagnostic permanent records has no notations of inmate claiming to be homosexual ore involved in any homosexual relations. [sic]

(Exh. D at 12, Exh. C at 152 (typed transcription of same)).

---

[2] Unless otherwise noted, citations to exhibits refer to Defendant's exhibits to her summary judgment motion, D.E. 48.

3

The McConnell Unit was notified of Defendant Strong's decision on April 15, 2003. The computer-recommended custody level was General Population Level IV or General Population Level V. The UCC assigned Plaintiff to a custody level of General Population Level IV. (Exh. C at 4). The McConnell Unit Classification could have grieved Strong's decision, but they did not, nor did they provide her with additional information prior to April 18, 2003. On April 15, Clark was returned to the general population. (Exh. A; Exh. F).

On April 18, 2003, Plaintiff was attacked by four other inmates,[3] three of whom are either confirmed or possible members of the two gangs that Clark had complained he was at risk of assault from – the Bloods and the Crips. (Exh. C at 120). Plaintiff received injuries, including bruises to his face, ears, arms, torso, scrapes to his right middle finger, and a broken right thumb. (Exh. C at 113, 121-23). After the attack, on April 25, 2003, the McConnell Unit provided a second Life Endangerment Investigation to Defendant Strong. According to Strong, this second investigation contained new and specific objective information that substantiated that Clark was at risk. (Id. at Exh. A; Exh. C at 113-39). On May 9, 2003, Strong decided to place Clark in safekeeping and reassigned him to the Telford Unit based on the new "evidence" corroborating his claims, i.e., the fact that he had been attacked. (Id. at Exh. A; Exh. D at 13). Clark arrived at the Telford Unit on May 16, 2003.

---

[3] Defendant's statement of facts recites that Plaintiff was attacked by a single inmate, but Plaintiff avers that he was attacked by four inmates – and there are documents in the summary judgment record support such an inference. (Exh. C at 113, 115-119). The facts are construed in the light most favorable to Plaintiff.

4

## IV.  PARTIES' CONTENTIONS

In her motion for summary judgment, Defendant Strong contends that she is entitled to qualified immunity, both because Plaintiff cannot show that she was deliberately indifferent to a substantial risk of harm to him, and because her conduct was objectively reasonable.  Second, to the extent Plaintiff seeks monetary damages from Defendant in her official capacity, Defendant asserts that she is entitled to Eleventh Amendment immunity.  Finally, she contends that the Complaint should be dismissed for failure to exhaust administrative remedies.

In response, Plaintiff argues that Defendant is not entitled to qualified immunity because there is a dispute of fact as to whether Defendant was deliberately indifferent to a substantial risk of serious harm.  Plaintiff also argues that he exhausted his administrative grievances.  Plaintiff appears not to dispute that Defendant is entitled to Eleventh Amendment immunity to the extent that he seeks monetary damages from her in her official capacity.

In his own motion for summary judgment, Plaintiff essentially moves for summary judgment on the grounds that Defendant is not entitled to qualified immunity.  He also reiterates his claim for injunctive relief, and requests that he not be housed in the general population again while in the custody of TDCJ without his written consent.

In responding to Plaintiff's motion for summary judgment, Defendant relies primarily on the arguments and evidence in her motion for summary judgment and dismissal.  She contends that Plaintiff has failed to demonstrate that there are no genuine issues of material fact, nor established each element of his cause of action as a matter of law.

For the reasons set forth herein, Defendant's motion for summary judgment is GRANTED in part and DENIED in part.  Plaintiff's summary judgment motion is DENIED.

## V.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The judge must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  In making this determination, the judge must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motions.  Caboni v. General Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).  The court may not weigh the evidence or evaluate the credibility of witnesses.  See id.

Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify on the matters stated therein."  FED. R. CIV. P. 56(e); see also Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559, 1561 (5th Cir. 1992)(refusing to consider affidavits that relied on hearsay statements); Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987)(stating that courts cannot consider hearsay evidence in affidavits and depositions).  Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.  Matsushita Elec. Indus.

6

Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party

cannot rest on the mere allegations of the pleadings. FED. R. CIV. P. 56(e); Anderson, 477 U.S. at 248-

49.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no

reasonable juror could find for the nonmovant, summary judgment will be granted." Caboni, 278 F.3d

at 451.  "If reasonable minds could differ as to the import of the evidence . . . a verdict should not be

directed." Anderson, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether

the moving party has shown the absence of a genuine issue of material fact.  "[T]he substantive law

will identify which facts are material.  Only disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477

U.S. at 248.

## VI.  DISCUSSION

### A.      Eleventh Amendment Immunity

Defendant's argument that the Eleventh Amendment bars suits against persons in their official

capacities is correct.  To the extent plaintiff is suing Defendant Strong for money damages in her

official capacity, his claims are barred by the Eleventh Amendment. Pennhurst State School and Hosp.

v. Halderman, 465 U.S. 89 (1984); Ganther v. Ingle, 75 F.3d 207 (5th Cir. 1996).  Therefore,

Defendant's motion for summary judgment is GRANTED as to Plaintiff's claims for monetary

damages against her in her official capacity.  The motion for summary judgment on Plaintiff's

remaining claims is discussed in subsections B and C below.

B.      Exhaustion

Defendant contends that plaintiff has failed to exhaust available administrative remedies. Pursuant to 42 U.S.C. § 1997e(a),  "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." A prisoner must exhaust administrative remedies for lawsuits "about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see also Clifford v. Gibbs, 298 F.3d 328 (5th Cir. 2002). The requirement of exhaustion applies regardless of whether the prisoner may obtain the type of relief sought in the state's administrative process. Booth v. Churner, 532 U.S. 731, 734 (2001); Wright v. Hollingsworth, 260 F.3d 357, 358 (5th Cir. 2001).

The purpose of the exhaustion requirement is to alert jail officials of problems so that the jail has a chance to address the claims before they reach federal court. Curry v. Scott, 249 F.3d 493, 505 (6th Cir. 2001). As acknowledged by the Supreme Court, Congress intended the administrative process to "filter out some frivolous claims and foster better-prepared litigation once a dispute did move to the courtroom, even absent formal factfinding." Booth, 532 U.S. at 737.

An inmate must proceed through all available steps in the institutional system. Wright, 260 F.3d at 358. In the Texas Department of Criminal Justice–Correctional Institutions Division, inmates follow a two-step process to exhaust their remedies. Wendell v. Asher, 162 F.3d 887, 891 (5th Cir. 1998); TEXAS DEPARTMENT OF CRIMINAL JUSTICE, Administrative Directive No. AD-03.82 (rev. 3) (Aug. 1, 2002).

In his complaint, Plaintiff checked "yes" to the question regarding whether he has availed himself of the state prisoner grievance procedure. Defendant acknowledges that Plaintiff filed both

a Step 1 and a Step 2 grievance *prior* to his transfer to the McConnell Unit, and prior to being denied safekeeping status by Defendant. (See Exh. E, pages 9-12, Step 1 Grievance # 2003095575, received January 30, 2003, and Step 2 Grievance #2003095575, received March 3, 2003).  In his Step 2 grievance, submitted March 3, 2003, Plaintiff appears to be aware of his impending transfer to the McConnell Unit.  In several places in his grievance, in emphasized text, he states that a simple transfer to another unit will not solve the problem, and that he is requesting that he be placed on "safekeeping status."  Thus, his Step 2 grievance, fairly read, encompasses a failure to place or keep him on safe-keeping status regardless of his unit assignment. (Exh. E at 9-10;  see also Exh. C at 180)(life endangerment request by Clark sent to Strong, in which Clark references his Step 2 grievance and his request not to simply be transferred).

    In its response to his Step 2 grievance, TDCJ did not respond to his request to be kept on safekeeping status, rather than merely transferred to the McConnell Unit.  Its response reads:

> Records indicate that you were transferred to another unit of assignment. This resolves your allegations of life endangerment on the Telford Unit.  If you experience problems on your new unit of assignment you should contact the Chief of Unit Classification via I-60 request.  No further action is warranted.

(Exh. E at 10).

    Making the determination as to whether or not Plaintiff has sufficiently exhausted his grievances in this case is a difficult task.  After his transfer to the McConnell Unit and subsequent denial of safekeeping status by Defendant Strong, Plaintiff did not file any grievance challenging Strong's decision or alleging a failure to protect, either in the days before the attack upon him, or afterward.[4]  Thus, it is clear that he did not file a grievance within fifteen days *after* Defendant Strong

---

[4] Plaintiff alleges that there was a "fifth" grievance that was stolen by guards, but offers nothing in support of this claim other than his conclusory allegation, and the grievance records submitted by Defendant do not contain any such grievance.  He also asserts that he filed a grievance on April 27, 2005 that referenced the attack on him, but

made her decision to deny him safekeeping status.  But, as discussed herein, that fact alone is not dispositive.

In a recent Fifth Circuit decision, <u>Johnson v. Johnson</u>, 385 F.3d 503 (5th Cir. 2004), the Fifth Circuit discussed at length a number of different claims brought by the plaintiff against various defendants and whether or not plaintiff had sufficiently exhausted them.  The plaintiff in <u>Johnson</u> had filed a grievance in March 2001 which he appealed through Step 2.  In that grievance, he complained that he was subjected to continuing sexual assaults and asked to be moved to a safe location away from his current building or unit.  There were three subsequent UCC meetings at which the plaintiff was denied safekeeping – in September 2001, December 2001 and January 2002.  None of these were followed within fifteen days by a Step 1 grievance, although the plaintiff filed a Step 1 grievance approximately 17 days after the December 2001 UCC meeting, again requesting that he be moved to some sort of protective housing.  He also appealed this grievance through Step 2.  385 F.3d at 519-21.

The Fifth Circuit held that his March and December 2001 grievances "were sufficient to exhaust claims that arose from the same continuing failure to protect him from sexual assault."  <u>Id.</u> at 521.  Thus, it rejected the defendants' suggestion that the plaintiff had failed to exhaust claims relating to the September 2001, December 2001, and January 2002 UCC meetings.  <u>Id.</u>

Similarly, in this case Plaintiff's February and March 2003 grievances complain of a failure to place him in safekeeping status, no matter what his unit assignment.  His Step 2 grievance, filed only one week before his transfer to McConnell and returned to him after his transfer), in particular, emphasizes that he continues to seek safekeeping status, not a simple unit transfer coupled with a return to the general population.

---

that grievance (Grievance #2003152352) in fact complained of his property being taken and requested that property be returned to him.  It did not raise any challenge to the failure to keep him in safekeeping status on any unit. (Exh. E at 23-24).

There are distinctions between this case and Johnson. Perhaps most notably, the prison administration in Johnson apparently interpreted the plaintiff's grievances as being complaints about a continued lack of protection, while in the instant case, the response by the prison administration to Clark's March 3, 2003 Step 2 grievance treated it as a complaint solely about conditions on the Telford Unit, rather than a general claim about a lack of protection. Nonetheless, this distinction does not alter the conclusion of the undersigned. Fairly read, Plaintiff's March 2003 Step 2 grievance is, in fact, a complaint about a *continuing* need for protection. Nowhere is this more clear than in Clark's repeated references to the fact that a mere transfer would not solve his problem. Thus, although it is a difficult decision, the undersigned concludes that dismissal or summary judgment on this issue would be inappropriate. Just as the March 2001 and December 2001 grievances in Johnson were sufficient to exhaust claims arising from September 2001, December 2001, and January 2002 UCC meetings, Clark's February and March 2003 grievances are sufficient to exhaust claims arising from the April 2003 decision of the Defendant to deny him safekeeping status.

For the foregoing reasons, the undersigned concludes that Clark has sufficiently exhausted his claim against Kelly Strong for failure to place him on safekeeping status. This conclusion, moreover, is supported by the rationale for requiring prisoner litigants to follow administrative grievance procedures. See Johnson, 385 F.3d at 516-17 ("a court must interpret the exhaustion requirement in light of its purposes, which include the goal of giving officials 'time and opportunity to address complaint internally.'"). Here, TDCJ was put on notice of Clark's need for protection, and it had both time and opportunity to address the complaint. Clark specifically warned in his grievance that a transfer to McConnell, without continued safekeeping status, would not sufficiently protect him, an admonishment that proved to be true.

For the foregoing reasons, Defendant's motion to dismiss for failure to exhaust administrative remedies is DENIED.

**C.     Qualified Immunity**

Defendant also argues for summary judgment against Plaintiff's complaint on the grounds of qualified immunity. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Once a defendant invokes the defense of qualified immunity, the burden shifts to plaintiff to show that the defense is inapplicable. McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002)(en banc)(per curiam).

Assessing the defense of qualified immunity is a two-step process. First, using currently acceptable constitutional standards, the court determines whether the facts alleged by the plaintiff show the violation of a clearly established constitutional right. Saucier v. Katz, 533 U.S. 194, 201, (2001). If so, then the court must decide if the defendant's conduct was objectively reasonable, because even if an official's conduct violates a constitutional right, he is entitled to qualified immunity if the conduct was objectively reasonable. Id. at 205.

The touchstone of the "objectively reasonable" inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law. Goodson v. City of Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000). For a right to be clearly established, there does not have to be a prior case directly on point, but the unlawfulness of the precipitating acts must be apparent in light of the existing law." Hassan v. Lubbock Independent School Dist., 55 F.3d 1075, 1079 (5th Cir.)(citing Anderson, 483 U.S. at 640), cert. denied, 516 U.S. 995 (1995). "The contours of the right must be sufficiently

clear that a reasonable person would understand that what he is doing violates that right." <u>Anderson</u>, 483 U.S. at 640.

### 1.    Qualified Immunity: Constitutional Violation Analysis

The first part of the qualified immunity analysis, then, requires a determination of whether a constitutional right would have been violated on the facts in the record. <u>Saucier</u>, 533 U.S. at 200. Plaintiff's allegations, as detailed above, assert that Strong violated the Eighth Amendment by failing to protect him from other inmates when Strong made the decision not to keep him on safekeeping status as recommended by the UCC.

To make out an Eighth Amendment claim based on a failure to protect, Plaintiff must show that he was incarcerated under conditions posing serious harm and that Strong was deliberately indifferent to his need for protection. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994). "Deliberate indifference describes a state of mind more blameworthy than negligence"; there must be "more than ordinary lack of due care for the prisoner's interests or safety." <u>Farmer</u>, 511 U.S. at 835 (construing <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)). Rather, in order to act with deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 836; <u>Neals v. Norwood</u>, 59 F.3d 530, 533 (5th Cir. 1995). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact." <u>Newton v. Black</u>, 133 F.3d 301, 308 (5th Cir. 1998)(citing <u>Neals</u>, 59 F.3d at 533).

Having considered the entire record, it is clear that Strong was aware of facts from which the inference could be drawn that Plaintiff's safety was at risk. Moreover, the undersigned also concludes that there are sufficient facts in the record from which a jury could find that Strong actually drew the inference. Notably, "[i]n order to prove that an official is subjectively aware of a risk to inmate health

13

or safety, a plaintiff inmate need not produce direct evidence of the official's knowledge.  A plaintiff can rely on circumstantial evidence indicating that the official must have known about the risk." Adames v. Perez, 331 F.3d 508, 512 (5th Cir. 2003); Farmer, 511 U.S. at 836.

In this case, the documentation in the summary judgment record contained sufficient facts from which a jury could conclude the risk was so obvious that Strong must have known of it.  Strong does not identify with specificity which portions of the summary judgment exhibits she actually reviewed. Strong's affidavit states that, prior to making her decision to deny safekeeping, she reviewed "Mr. Clark's committee card, his UCR screens, the submitted investigation, and his permanent folder." (Exh. A, Strong Aff. at 1).  Later in her affidavit, however, she also states that she reviewed "every available resource" prior to making her decision.  (Id. at 2).

The documents submitted by Defendant that were contained in some portion of TDCJ files (presumably an "available resource" to Strong), however, include the following:

- A document from the STG group reflecting that Clark previously assaulted an offender who was a suspected Crip, and that several of the individuals mentioned by Clark as threatening or assaulting him at the Telford Unit were also members of either the Crips or the Bloods (Exh. C at 108);
- Documentation that he has a "crip killer" tattoo from the time when he was a member of the Bloods (Exh. C at 108, 129);
- A recommendation from the UCC reviewing his claim that he be placed on safekeeping status (Exh. C at 112);
- A March 11, 2003 memo prepared for the McConnell Unit UCC by the STG Officer which contains specific information regarding Clark's gang affiliation, and past problems with Bloods and Crips, including physical altercations.  (Exh. C at 129).  The memo concludes:

> [T]he information documented on this report indicates BLOOD and CRIP members may have been targeted [sic] Offender Clark for assault due to being associated with them and because he is an admitted homosexual.  This information indicates Clark has experienced problems with BLOOD and CRIP members and is afraid problems will continue on the McConnell Unit.

(Exh. C at 129).

Additionally, the documentation is clear that his transfer from the Telford Unit was the result of concerns about Plaintiff's safety, and particularly concerns about violence from Blood or Crip gang members. (Exh. C at 140, 164-65). Moreover, the individual that he alleges threatened him during his first day at the McConnell Unit was a confirmed Crip that had been moved from the Telford Unit with him, and thus is likely to have knowledge of his past affiliations and past problems with Bloods or Crips at the Telford Unit. (Exh. C at 129).[5]

The foregoing suggests there was ample evidence to "corroborate" Plaintiff's claim that he was being threatened by members of the Crips and Bloods. There is also some evidence in the record to support his claim of having engaged in at least an involuntary sexual act with another male prisoner, although that information is less conclusive. Plaintiff had previously claimed to have been sexually assaulted by a fellow prisoner. (Exh. C at 210-211, 253-54). Additionally, there are several notations in his disciplinary record of "sexual misconduct," although no additional information is provided as to what the misconduct was. (Exh. C at 340, Exh. D at 6, 8 (referencing four distinct incidents of sexual misconduct)); see also Exh. C at 237 (referring to "Sex Misc." in his disciplinary history). The undersigned also finds it significant that Defendant Strong did not appear to give any weight to the decision of the McConnell Unit UCC that Plaintiff should be placed in safekeeping, both because of his admitted homosexuality and because of his prior affiliation with the Bloods. (See Exh. C at 4, 169)

In short, the record as a whole certainly could allow a jury to conclude that there was sufficient evidence from which Strong should have drawn the inference that Clark was at risk, and in

---

[5] Interestingly, Defendant has submitted an affidavit by a records custodian which states that, because "he is not confirmed as a member of any security threat group within the Texas Department of Justice," there is no security threat group file or records regarding Offender Clark ... as a security threat group member." (See Exh. G.) Other documentation in the case, however, appears to indicate the contrary. See Exh. C at 129 (memo from a Security Threat Group Officer which states: "Security Threat Group file information pertaining to Offender Clark reveals he was being monitored due to correspondence which identifies him as being associated with the BLOODS").

fact did draw that inference.  By denying him safekeeping, a jury could find that she was deliberately indifferent to that risk.[6]  Thus, there are sufficient facts from which a jury could determine that a constitutional violation occurred.[7]

### 2.    Qualified Immunity: "Objectively Reasonable" Analysis

The undersigned turns next to the second part of the qualified immunity analysis, which requires a determination of whether Defendant's actions, even if unconstitutional, were "objectively reasonable." Saucier, 533 U.S. at 205.    As noted, the touchstone of this inquiry is whether a reasonable person would have believed that her conduct conformed to the constitutional standard in light of the information available to her and the clearly established law.  Goodson v. City of Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000).   Based on the current record, there is a genuine dispute as to whether Defendant's conduct was objectively reasonable.  In light of the evidence discussed in the preceding section, there was ample evidence to show that it was objectively unreasonable to place

_____

[6] Indeed, shortly after the April 18, 2003 attack against him, Strong granted Plaintiff safekeeping status. She contends that there was "new" evidence to support her later decision, but the only new evidence was the attack.  As the Supreme Court has stated, "a subjective approach to deliberate indifference does not require a prisoner seeking a remedy for unsafe conditions to await a tragic event such as an actual assault before obtaining relief."  Farmer, 511 U.S. at 845 (citation and internal brackets omitted).

[7] In further support of her motion, Defendant has also submitted a letter addressed to Defendant's counsel from John Wyeth ("Wyeth"), another member of the SCC.  In the letter, Wyeth essentially explains the relationship between the SCC and the UCC, and also offers his assessment of the factual background in this case.  He further states that, if the "identical situation were presented today for [his] review ... it would not be possible for him to agree that the subject should be placed in safekeeping status as is recommended by the unit classification committee based on the limited information provided."

As an initial matter, the letter is not sworn testimony and is not based on personal knowledge, and, therefore, it is not competent summary judgment evidence. FED. R. CIV. P. 56(e); King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994). Additionally, any opinion by Wyeth as to the correctness of Strong's decision not to place Clark on safekeeping is probably an expert opinion, and he has not been qualified or offered as an expert.  For these reasons, the undersigned has not considered Wyeth's letter.

Even if it were considered as part of the summary judgment record, however, Wyeth's letter repeatedly references the "limited information" given to Strong by the UCC.  He appears to be arguing that the information given by the UCC was insufficient to determine that there was a real threat to Plaintiff's safety. In her affidavit, however, Strong indicates that she "reviewed every available resource" before she made her decision not to place Clark on safekeeping.  (Exh. A, Strong Aff. at 2).  Thus, the "limited information" provided by the UCC would not explain or excuse Strong's decision to deny safekeeping status.

Clark back in the general population. The threats he had identified were supported by documentation and buttressed by the UCC's determination that he needed safekeeping. Thus, a reasonable jury could easily conclude that Defendant's actions were not objectively reasonable.

For all of the foregoing reasons, Strong is not entitled to summary judgment on the grounds of qualified immunity.

**D.     Plaintiff's Motion for Summary Judgment**

Plaintiff has also moved for summary judgment in his favor. For the reasons discussed in this order, there are disputes of fact regarding Defendant Strong's entitlement to qualified immunity that preclude the entry of summary judgment in favor of either party. Plaintiff's motion for summary judgment is therefore DENIED.

## VII.  CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss and for summary judgment (D.E. 48-1, 48-2) is GRANTED as to any claims against Strong in her official capacity for monetary damages. It is DENIED in all other respects. Plaintiff's motion for summary judgment (D.E. 49) is DENIED.

ORDERED this 3rd day of June, 2005.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

17